UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TBS GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16-cv-5855 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF ZION, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

TBS Group, LLC, brought suit against the City of Zion, Illinois, alleging that Zion's adoption of a rental unit inspection ordinance and a "Comprehensive Plan" (the City's official development strategy), violates the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* by allegedly seeking to shrink the amount of available housing for African-Americans and Latinos.[1] R. 23, Am. Compl.[2] Zion now brings a motion to dismiss, R. 32, Def.'s Mot. to Dismiss, under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons discussed below, the motion to dismiss is granted.

## I. Background

For purposes of this motion, the Court accepts as true the allegations in the Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). TBS Group owns dozens of rental units in Zion, Illinois. Am. Compl. ¶¶ 1, 15. According to TBS, all of its properties are in neighborhoods populated mostly with minorities and TBS rents

---

[1] This Court has subject matter jurisdiction under 28 U.S.C § 1331.
[2] Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

almost exclusively to African-American or Latino tenants. *Id.* ¶ 1.

In July 2015, Zion adopted Ordinance 15-O-33, which added rental housing inspection and certification regulations to Zion's Municipal Code. Zion Code § 10-180;[3] *see also* Am. Compl. ¶ 20; Def.'s Mot. to Dismiss at 1. The ordinance requires all Zion property owners who rent out units to maintain a "current and valid city-issued certificate of compliance." *Id.* § 10-180(2)(a). To get a certificate, a unit needs to pass an inspection,[4] *id.* § 10-180(5)(a), for which landlords are charged "$75.00 per dwelling unit," *id.* § 10-9(c) (fee schedule for inspections).[5]

In order to obtain a compliance certificate for a dwelling unit, the unit must be free of any condition "that would constitute a hazard to the health and safety of the occupants" and must be "otherwise fit for occupancy." Zion Code § 10-180(5)(c). Landlords must keep the unit in a "safe, habitable, and code-compliant condition" or else lose the certificate upon re-inspection. *Id.* § 10-180(5)(d). If a unit fails an inspection, then the code official reports the violations to the owner and issues a

---

[3] TBS did not attach a copy of the Ordinance to its complaint. Zion, in its motion to dismiss, included a copy of the Ordinance as an exhibit. R. 32, Zion's Mot. to Dismiss, Exh. 1 (Rental Housing Inspection and Certification Ordinance). Of course, the Court may consider the Ordinance without converting the dismissal motion into a motion for judgment on the pleadings because TBS challenges the Ordinance in the complaint and the Ordinance is a local law, not a fact outside the pleadings. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) ("documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.") (internal quotation marks and citations omitted); *see also Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977) ("matters of public record such as state statutes, city charters and city ordinances fall within the category of 'common knowledge' and are therefore proper subjects for judicial notice.").

[4] There are other paperwork requirements for getting a certificate that are not relevant to this case. *See* Zion Code § 10-180(4).

[5] For residential buildings with more than 132 "multiple-family dwelling units," rental certification inspection fees are capped at $10,000 a year. Zion Code § 10-9(c).

notice to comply. *Id.* §§ 10-180(5)(c), 10-180(5)(h). A new inspection is scheduled and the process repeats until the owner gets it right. *Id.* § 10-180(5)(i). Units that passed inspection without a problem get a compliance certificate that is good for two years; those that needed to correct a violation get a certificate that lasts only one year. *Id.* § 10-180(3)(a)(ii).[6] Any rental unit that is out of compliance is fined between $100 and $750 a day as a penalty. § 10-180(9)(a).[7]

TBS received notices from the Zion Building Department, notifying TBS of the requirement to obtain certificates of compliance. *See* Am. Compl., Exh. A. The group exhibit attached to the Amended Complaint includes 15 initial letters, which cover various TBS rental properties and notify TBS of the rental inspection regulations and requirements, and another 15 follow-up letters, labelled "FINAL NOTICE," covering those same properties. *Id.*; Am. Compl. ¶ 21.

_____

[6] The Ordinance also lays out an appeals procedure that is not relevant here. *See* Zion Code § 10-180(6).

[7] TBS contends that "[u]nder the rental *registration* and inspection ordinance, Ordinance 15-O-33, [r]egistration and inspection fees are $100.00 or more *each*. Violations can accrue a fine of $750.00 per day the alleged violation exists and up to $10,000 per year." Am. Compl. ¶ 20 (emphases added). It is unclear what is meant by "registration" and "each" in the first sentence. There is no "registration" fee mentioned in the Ordinance cited by TBS, although it is possible that TBS is referring to the already-existing "certificate of occupancy" fee for residential units listed in the "Permit fee schedule" of the same code chapter. *See* Zion Code §§ 10-9(c) (listed as $100 for residential units and $50 for each unit after the first two in a residential building). In any event, noted above, the inspection fee for each unit is $75, not $100 (perhaps TBS meant that registration and inspection fees are $100 or more when totaled for each unit, and not that registration and inspection fees are each at least $100 per unit. Or TBS might be referring to the late fee for compliance applications, which is priced at $150 in one of the letters sent by the City of Zion Building Department, Am. Compl. Exh. A at 2). With regard to the fines, there is no explicit ceiling on the daily fines that can accrue. Instead, $10,000 is the cap on inspection fees for 132 or more rental units, Zion Code § 10-9(c), which might be where TBS got the $10,000 figure from. Under the Ordinance, it is possible that an out of compliance rental unit could actually be fined $36,500 to $273,750 a year, depending on the daily penalty rate (limited by the ordinance to the range of $100 to $750, *id.* § 10-180(9)(a)).

TBS Group contends that Zion's rental inspection ordinance violates Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a), in that it allegedly makes "housing unavailable because of race, national origin, or color …" Am. Compl. ¶ 25. TBS says, "[o]n information and belief," that the ordinance is being "enforced selectively against landlords who have African-American and Latino tenants." *Id.* ¶ 24. This selective enforcement is made possible, TBS argues, because "[t]he criteria for the inspections is not defined" and therefore Zion has "latitude in deciding which properties 'pass' and which do not." *Id.* ¶ 23. This "vague[ness]" allows rental unit inspection compliance decisions to be made in a discriminatory way, "deem[ing] properties occupied by African-American and Latino tenants unrentable." *Id.* TBS also appears to contend that, even if its properties were all deemed code-compliant, the inspection fees themselves are unaffordable. *Id.* As a result, TBS asserts, the ordinance makes fewer housing units available to blacks and Latinos because it prices out landlords like TBS who rent primarily to those racial minorities.

To support its argument, TBS relies on demographic statistics set forth in the Amended Complaint. TBS contends that blacks are overrepresented as renters in the area, making up 31% of Zion's population but accounting for 39.3% of the renting community. *Id.* ¶ 7. Whites, on the other hand, are 48.9% of Zion's population, but only 39% of renters. *Id.*[8] TBS suggests (at least as far as data from 1980 to 2000 can show) that the number of black renters has been increasing sharply while the number of white renters has fallen over time. *Id.* ¶¶ 8-9.

---

[8] TBS also gives figures for the Latino population: they comprise 27% of Zion's population and 14.9% of Zion's renters. Am. Compl. ¶ 7.

With these population numbers as a background, TBS goes on to list incidents—over the past few decades—that allegedly show Zion's attempts to discriminate and limit rental units available to blacks and Latinos. *See* Am. Compl. at 3-7. First, in 1982, a real estate developer brought a fair housing case against Zion, alleging that the city was trying to curtail construction of "Section 8" housing. *Id.* ¶ 12. "Section 8" refers to Section 8 of the Housing and Community Development Act of 1974, 42 U.S.C. 5301 *et seq.*, which authorizes the Secretary of Housing and Urban Development to enter into contracts with landowners in order to help low-income families finding suitable housing. The developer's suit alleged that Zion did not want any more "undesirable" people. *Id.* ¶ 12.[9]

Moving forward to the mid-1990s, TBS asserts that "[i]n a[n] … attempt to eliminate rental housing for African-Americans," Zion passed ordinances declaring 2100-2700 Hebron Avenue, the heavily black area where TBS's properties are located, as "blighted." Am. Compl. ¶ 15(b). TBS does not cite the ordinances, but gives a link to a 1994 *Chicago Tribune* article on Zion's "blight" declarations and a related federal housing investigation assessing possible discrimination. *Id.* ¶ 15(b) (citing Steve Mills, *Hud Probes Bias in Zion's Blight*, Chicago-Tribune, Dec. 22, 1994, http://articles.chicagotribune.com/1994-12-22/news/9412220273_1_blighted-blocks-landlords (accessed Sept. 14, 2017)). According to TBS, the blight ordinances ramped up segregation in the area, leading to a higher concentration of minorities

---

[9] The Amended Complaint cites to the denial of a motion to dismiss the developer's suit. Am. Compl. ¶ 12. But at that stage of a case (as in this case), the complaint is *assumed* to be true, and a denial of a motion to dismiss is not a finding that the allegations have been proven.

in the 2100-2700 Hebron Avenue neighborhood. Am. Compl. ¶ 15(c). By its reckoning, whites went from occupying about half of the available housing in the area in the early 1990s to 38 percent in 2010. *Id.*

TBS also alleges that Zion's "Comprehensive Plan," approved in December 2015, is another example of the city's discriminatory approach to housing. Am. Compl. ¶ 16.[10] According to TBS, that Plan "will make housing unavailable" for racial minorities in violation of the Fair Housing Act, because it "includes multiple-family housing (rental) relegated almost exclusively to a south-eastern area next to industrial uses and remote from green space." *Id.* ¶¶ 16, 26. As another example of discrimination, TBS mentions another Zion ordinance that allegedly classifies properties as "nuisance" properties merely because the residents of the property call the police for help. *Id.* ¶ 17.[11]

In addition to the ordinances and the Comprehensive Plan, the Amended Complaint also offers certain remarks made by Zion mayors in support of the allegations of discrimination. Around 2005, then-Mayor Lane Harrison allegedly said to TBS that he did "not want more African-Americans to move into" TBS's property. Am. Compl. ¶ 11. Around ten years later, in 2015, Zion Mayor Al Hill

---

[10] As described by TBS, "[t]he Planning and Zoning Board governs … preparation and recommendation of a comprehensive plan, to suggest reasonable requirements with regard to streets, roads, and alleys, to suggest specific improvements to the comprehensive plan, to recommend zoning changes, and to hear appeals of decisions of the building inspector." Am. Compl. ¶ 5. (citing Zion Ordinance 201-O-19).

[11] TBS does not cite the ordinance, but gives a link to a news article on the debate surrounding it. Am. Compl. ¶ 17 (citing Luke Hammill, *Zion Nuisance Property Ordinance Raises Concerns Among Affordable Housing, Property Rights Advocates*, News-Sun, Feb. 17, 2017, www.chicagotribune.com/suburbs/lake-county-news-sun/news/ct-lns-zion-nuisance-propertyordinance-st-0215-20170217-story.html).

allegedly said that he wanted to shrink the rental percentage of housing in Zion from its current level of 60% to a "healthy" 20% to 30%. *Id.* ¶ 10. Then, in deliberating over the rental inspection ordinance in February 2017, Mayor Hill said that "Zion has 3.5 percent [of] the population of Lake County" but "38 percent of the Section 8 vouchers" awarded by the county. He called this "an issue that we have to address," and cited "issues that are associated with too many rental units and too much Section 8 rental units." *Id.* ¶ 18. TBS also cites an incident at a public forum on the rental inspection ordinance, where a resident "referred disparagingly to 'Section 8' and 'these people,'" and officials responded by pointing to the "disproportionate number of 'Section 8' vouchers in Zion." *Id.* ¶ 19.

In January 2017, the previously assigned judge dismissed TBS's original complaint for failure to state a claim, but gave TBS the chance to amend it. R. 22, Opinion and Order (Jan. 23, 2017). TBS did so, and now Zion moves to dismiss the Amended Complaint for failure to state a claim. *See* Def.'s. Mot. to Dismiss; R. 37, Def.'s. Rep. Br.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). The Seventh Circuit explained that

this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Allegations that are entitled to the assumption of truth are those that are factual, instead of mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

Among other things, the Fair Housing Act prohibits race and color discrimination in the selling and renting of housing. 42 U.S.C. § 3601 *et seq.* It is illegal to "refuse to sell or rent ... or otherwise make unavailable or deny, a dwelling" to someone because of race or color (among other protected characteristics), 42 U.S.C. § 3604(a), or to "discriminate against any person [based on race, color, or other protected characteristics] in the terms, conditions, or privileges of sale or rental of a dwelling." *Id.* § 3604(b). At its core, then, individuals who are denied housing based on their race may bring suit under the Fair Housing Act. *Havens*

*Realty Corp. v. Coleman*, 455 U.S. 363, 375 (1982). Covering more than those individuals, however, the Fair Housing Act authorizes any "aggrieved person" to bring a fair-housing suit, 42 U.S.C. § 3613(a), that is, any person who "claims to have been injured by a discriminatory housing practice," or is about to be injured. *Id.* § 3602(i). Supreme Court precedent instructs that any person or entity whose alleged injury falls within the Fair Housing Act's "zone of interests" qualifies as an aggrieved person. *Bank of America Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302-03 (2017); *see also Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) ("The language of the [Fair Housing Act] is broad and inclusive."). This gives "aggrieved person" a "broad" construction. *Bank of America Corp. v. City of Miami, Fla.*, 137 S. Ct. at 1303. And, specifically, financial injuries caused by discriminatory housing practices qualify as the type of injury that an aggrieved person may file suit against. *See id.* at 1304 (city was an aggrieved person because the alleged discriminatory practice caused a concentration of foreclosures and vacancies, reduced property values, and diminished property-tax revenue). Although Zion makes a cursory argument that TBS has not sufficiently alleged injury under the Fair Housing Act, the Amended Complaint readily sets forth a financial injury—the certificate-compliance fees for rental units—that allegedly is the product of race discrimination. That sort of alleged injury is well within the zone of interests of the Fair Housing Act.

That said, even if TBS has alleged a covered injury, the question remains whether the Amended Complaint sufficiently alleges that Zion adopted the

compliance-certificate Ordinance in order to deny housing to racial minorities. There are two pertinent forms of discrimination barred by the Fair Housing Act (1) disparate treatment; and (2) disparate impact. *Cty. of Cook v. HSBC N. Am. Holdings Inc.*, 136 F. Supp. 3d 952, 966 (N.D. Ill. 2015). In the Amended Complaint, TBS did not spell out specifically what type of discrimination claim it was bringing, but it later clarified that it was pursuing both the disparate treatment and disparate impact avenues. *See* Pl's. Resp. Br. at 5. The Court turns to those next.

## A. Intentional Discrimination

To state a disparate treatment claim under the Fair Housing Act ("disparate treatment" is just another way of saying intentional discrimination), TBS must plausibly allege that Zion had a discriminatory intent or motive. *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Intentional discrimination can be alleged through "either direct or circumstantial evidence." *Daveri Dev. Grp., LLC v. Vill. of Wheeling*, 934 F.Supp.2d 987, 997 (N.D. Ill. 2013). "Proof of discriminatory motive … can in some situations be inferred from the mere fact of differences in treatment." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977). In this case, TBS does not plead enough facts to plausibly suggest that Zion has intentionally discriminated against racial minorities in its housing practices.

### 1. Selective Enforcement

First, TBS alleges that Zion is selectively enforcing the rental inspection ordinance against landlords that rent to racial minorities. Am. Compl. ¶¶ 23-24. But no *facts* are alleged in support of the bare conclusion that Zion is engaging in

selective enforcement. There is no factual assertion of an instance when any other landlord (that is, one who does not rent primarily to minorities) was or is treated differently from TBS with regard to the rental inspection ordinance. Although TBS alleges that the challenged ordinance "giv[es] Defendant latitude in deciding which properties 'pass' and which do not" and thus allows it to "be applied in a discriminatory manner," *id.* ¶ 23, TBS pleads nothing about this abuse of discretion in action. TBS does not, for instance, say that it (or any other landlord with mostly minority tenants) was cited by Zion for being in violation of the municipal code more often than other landlords or for infractions that would not be pursued against other landlords. In fact, as far as the pleadings are concerned, TBS has not been cited by Zion *at all* for failure to maintain code-compliant conditions. TBS has only received notifications to arrange an inspection and then follow-up letters saying that those inspections have not yet been arranged (and that they must be, in accordance with the Ordinance). Perhaps TBS means to argue that the very fact that the City sent the letters to TBS constitutes selective enforcement, but even there, TBS does not allege that other Zion landlords (who do not rent primarily to minorities) did not receive the same notifications and warnings about the Ordinance. Nothing TBS has alleged plausibly suggests any selective enforcement by Zion.

At bottom, the selective enforcement claim is premised on one conclusory allegation: "On information and belief, the code is enforced selectively against landlords who have African-American and Latino tenants." Am. Comp. ¶ 24. To be sure, pleading a fact on "on information and belief" does not necessarily disqualify

the allegation for consideration, especially where a defendant has exclusive access to crucial information. But TBS does not explain why it believes the important facts about Zion's enforcement of the ordinance (who got cited or received a letter versus who did not) would be within the exclusive control of Zion. And, most importantly, the key (and sole) allegation is not even *factual*, but merely a conclusion. That type of pleading "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-679. The Amended Complaint does not adequately state a claim for selective enforcement of the Ordinance.

## 2. The Ordinance and the Comprehensive Plan

Moving on, TBS goes beyond alleging selective *enforcement* of the Ordinance: TBS also alleges that even Zion's *adoption* of the Ordinance, as well as the adoption of the Comprehensive Plan, was motivated by intentional race discrimination. In support, TBS offers the following allegations as a basis to infer intent:

1. In 1982, a federal-court complaint was filed against Zion alleging racially motivated curtailing of rental development; the complaint survived a motion to dismiss. Am. Compl. ¶ 12.

2. In the early and mid-1990s, blight ordinances were enacted, allegedly having a segregating effect on the community. *Id.* ¶ 15.

3. Comments from past or present mayors about Zion's renting population. *Id.* ¶¶ 10-11.

4. A current Zion ordinance that allegedly classifies properties as nuisances if residents at the properties seek help from the police. *Id.* ¶ 17.

5. Zion's current "Comprehensive Plan," which TBS says relegates multi-family rental space to industrial areas and away from green spaces. *Id.* ¶ 16.[12]

When evaluated against the pertinent factors, that series of allegations does not give rise to a plausible inference that Zion adopted the Ordinance with the intent to discriminate. In considering a disparate treatment claim against a municipal ordinance, federal courts consider "the historical background of the decision … particularly if it reveals a series of official actions taken for invidious purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). Also, "[t]he specific sequence of events leading up [sic] the challenged decision also may shed some light on the decisionmaker's purposes," *id.*, and "[t]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports," *id.* at 268. Even if a law or ordinance is just maintaining the status quo, it can run afoul of the Fair Housing Act if that status quo was based on a history of discriminatory practices. *Rogers v. Lodge*, 458 U.S. 613, 625 (1982). It is worth a reminder that, at this stage of the litigation, TBS is entitled to reasonable inferences.

---

[12] It is not crystal clear whether TBS intended to bring a standalone Fair Housing Act claim based on the Comprehensive Plan itself, *see, e.g.*, Am. Compl. ¶ 26 ("Zion's adoption and imminent implementation of the Comprehensive Plan will make housing unavailable because of national origin, race, or color in violation of Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a)"); Pl's. Resp. Br. at 5 ("Count I States Claims for violation of 42 U.S.C. §§ 3604(a)-(b) relative to Defendant's Ordinance and Comprehensive Plan"), or whether the Comprehensive Plan is offered only as further circumstantial evidence for the rental inspection ordinance discrimination claims, Am. Compl. ¶ 16 (listing the Comprehensive Plan as "another attempt to limit rentals available to African-Americans and Latinos," alongside the 1982 case and the blight and nuisance ordinances, Am. Compl. ¶¶ 12, 15, 17; *see also* Def's. Rep. Br. at 4 (pointing out that TBS does not respond to any of Zion's arguments relating to the Comprehensive Plan)—or both. The Court thus considers the Plan in both contexts.

But the first set of allegations on which TBS relies is from two or even three decades ago, and invoking "historical background" to prove race discrimination does not necessarily mean stretching indefinitely back in time. *See McCleskey v. Kemp*, 481 U.S. 279, 298 n. 20 (1987) ("Of course, the historical background of the decision is one evidentiary source for proof of intentional discrimination. But unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value.") (internal quotation marks and citation omitted); *see also Laramore v. Ill. Sports Facilities*, 1996 WL 153672, at *13 (N.D. Ill. Apr. 1, 1996) ("given the change in the political realities, plaintiffs simply cannot rely on a past climate of racial discrimination … as evidence that [a current municipal] decision was racially motivated as well.") Start with the oldest allegation, from 1982: in *West Zion Highlands v. City of Zion*, a landlord brought a Fair Housing Act claim against Zion. The landlord alleged that, by preventing the landlord from proceeding with its planned housing development, the City was engaging in racial discrimination. 549 F. Supp. 673, 675-676 (N.D. Ill. 1982). As TBS points out, the district court denied Zion's motion to dismiss the claim. *Id.* at 677. But at the dismissal-motion stage, the landlord enjoyed the benefit of all factual allegations being taken as true, as does any plaintiff facing a Rule 12(b)(6) motion. Courts need not give allegations in a separate lawsuit the presumption of truth; that type of allegation instead should be accorded only "limited corroborative weigh[t]." *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011). Indeed, TBS provides no additional information about the lawsuit, including how the three-

decades-old allegations in that lawsuit plausibly connect to the actions and motivations of Zion's *current* policymakers or to the rental inspection Ordinance. And TBS does not say what was the ultimate disposition of the case. The allegations in the 1982 lawsuit provide no help to TBS here.

TBS tries to continue the Zion storyline into the 1990s, but here again it still fails to link those events to the current rental inspection Ordinance. According to TBS, in an attempt to eliminate rental housing for African Americans, Zion passed "blight" ordinances in 1993 and 1995. Am. Compl. ¶ 15(b). But rather than provide a copy of, or even cite, the ordinances, TBS relies on a *Chicago Tribune* article for that proposition. Nor does the Amended Complaint describe how those ordinances operated against landlords who rented to blacks or Latinos. Nor, crucially, does it explain how the 1990s blight ordinances (whatever it is they did) connect to Zion's decision-making process 20 years later in 2015 when it adopted the rental inspection Ordinance. Yes, historical background and prior instances of alleged discrimination can be important in evaluating a Fair Housing Act claim, particularly when discrimination is entrenched. But decades-old allegations with sparse factual content cannot form part of "a series of official actions taken for invidious purposes" or a "specific sequence of events" leading to the "challenged decision." *Vill. of Arlington Heights*, 429 U.S. at 267.

Moving into the twenty-first century, TBS cites a comment, made in 2005, by then-mayor Lane Harrison. Am. Compl. ¶ 11. Mayor Harrison told TBS that he did not want more blacks to move into TBS's property in Zion. *Id.* The 2005 statement

was made around a decade before the adoption of the rental inspection Ordinance. Again TBS does not explain how the statement suggests that the rental inspection Ordinance was motivated by discrimination. Is the suggestion that the previous mayor's sentiments can be imputed to the members of Zion's City Council who adopted the Ordinance? Or that the former mayor, harboring views against black tenants, otherwise helped to bring about the current Ordinance? Even with the benefit of all reasonable inferences, and even against just a plausibility standard, TBS does not connect the dots.

The closest that TBS comes to plausible allegations of intentional discrimination are remarks by Zion officials to the effect that they want to reduce both the rental housing and the number of Section 8 vouchers in Zion. Specifically, in 2015, Mayor Al Hill said that he wanted to shrink the percentage of housing that is rented rather than owned in Zion from its current level of 60% to a "healthy" 20% to 30%. Am. Compl. ¶ 10. Along similar lines, when deliberating over the adoption of the rental inspection Ordinance in February 2017, Mayor Hill criticized the disproportionate number of Section 8 vouchers used in Zion versus other cities in Lake County: "Zion has 3.5 percent [of] the population of Lake County" but "38 percent of the Section 8 vouchers" awarded by the County. *Id.* ¶ 18. Mayor Hill expressed concern over "issues that are associated with too many rental units and too much Section 8 rental units." *Id.* TBS also cites remarks made during a public

forum on the rental inspection Ordinance,[13] where a resident "referred disparagingly to 'Section 8' and 'these people,'" and Zion officials responded by pointing again to the "disproportionate number of 'Section 8' vouchers in Zion." *Id.* ¶ 19.

Once again, however, these allegations fall short of a plausible claim of intentional discrimination in adopting the rental inspection Ordinance. First, TBS does not allege any facts that actually rebut Zion's expressed concerns over the housing allocation in the city, or rebut the legitimacy of those concerns. In other words, TBS does not dispute that 60% of housing in Zion is rented. TBS does not dispute that Zion has only 3.5% of Lake County's population, yet Zion has 38% of the Section 8 vouchers used in the County. In TBS's spare response brief, R. 33, Pl's. Resp. Br., it makes no attempt—whether based on facts or case law—to argue why Zion officials should not be concerned with what they viewed as disproportionate rental housing, why they should not be concerned with a disproportionate percentage of Section 8 housing when compared to the rest of Lake County, or why the rental inspection Ordinance is connected to all this. To be sure, it is *possible* to conceive of arguments that those concerns about the housing stock are pretext for racial discrimination—but TBS does not offer them, and the Court cannot cross the line into advocating on one side's behalf.

TBS offers two final sets of allegations in support of an inference of race discrimination. Neither helps. First, TBS refers to a "nuisance" ordinance that

---

[13] TBS alleges that the forum was held in October 2015. Am. Compl. ¶ 10. The YouTube page cited by TBS, https://www.youtube.com/watch?v=Hk8f_3NKN9g, states that it was published on October 31, 2015.

allegedly classifies a property as a "nuisance" if a resident calls for help from that property. Am. Compl. ¶ 17. But once again TBS only cites a newspaper article, rather than set forth the text of the actual ordinance, *id.*, leaving a yawning factual gap. How does the ordinance operate? What does it mean for a property to be dubbed a "nuisance"? When was the ordinance adopted relative to the rental inspection Ordinance? No connection can be drawn to the rental inspection Ordinance absent these basic facts.

Second and last of all, TBS says that Zion's current "Comprehensive Plan" raises the inference of race discrimination, because the Plan places multiple-family housing almost entirely in industrial areas and away from green spaces. Am Compl. ¶ 16. TBS again does not provide a copy of the Plan. Zion's website does appear to house the plan. Comprehensive Plan Update, December 1, 2015, *available at http://www.cityofzion.com/departments/economic_development/2016_final_zion_comp_plan.pdf* (last accessed Sept. 22, 2017). TBS cites to page 112, but that appears to be the overall .pdf page number, which includes non-paginated pages (like the cover page and the table of contents). The actual published pertinent page number is 94, entitled Future Land Use Plan. The map on that page sets forth future land-use designations, and it does show multi-family land use clustered near an industrial zone and not especially near green space. But what of it? TBS again makes no attempt to explain how that choice suggests an intent to discriminate on the basis of race. The response brief repeats the allegation, Pl's. Resp. Br. at 2, and mentions the Plan in a point heading, *id.* at 5—but that is all. TBS leaves factual

gaps: how was the Comprehensive Plan generated? Who was involved in creating it? What is its legal effect? The Comprehensive Plan spans about 200 pages (including appendices), yet TBS leaves it up to the Court to rummage through and put the pieces together. That burden is on TBS, especially in light of the myriad legitimate factors that go into city planning. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2523 (2015) ("Zoning officials, moreover, must often make decisions based on a mix of factors, both objective (such as cost and traffic patterns) and, at least to some extent, subjective (such as preserving historic architecture)."); *id.* ("The FHA does not decree a particular vision of urban development … ."). Ultimately, even accepting the truth of the *factual* (as distinct from conclusory) allegations and even with the benefit of reasonable inferences, TBS has not pled a plausible claim of intentional race discrimination.

## B. Disparate Impact

### 1. Rental Inspection Ordinance

To adequately state a claim of disparate impact under the Fair Housing Act, TBS must allege facts that raise a plausible inference that the rental inspection Ordinance "caused or predictably will cause a discriminatory effect" against a protected class. *Inclusive Communities Project, Inc.*, 135 S. Ct. at 2514; *see also Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1289–90 (7th Cir. 1977); *Cty. of Cook v. HSBC N. Am. Holdings Inc.*, 136 F. Supp. 3d 952, 966 (N.D. Ill. 2015). For a disparate impact claim, it is the disproportionate *effect* (or potential effect) of the challenged policy on racial minorities that comprises the

discrimination, and there is no need to prove (or, at this state, adequately allege) a racial discriminatory intent of the policy-makers. But *causation* remains a key element of a disparate impact claim: without causation, there is no liability. *Inclusive Communities Project*, 135 S. Ct. at 2523. Recently, in *Inclusive Communities Project*, the Supreme Court emphasized the importance of the causation element. If there were no "robust causality requirement," then housing developers or governments would be "held liable for racial disparities they did not create." *Id.* The importance of the causality requirement prompted the Supreme Court, in *Inclusive Communities Project*, to caution lower courts to evaluate these cases carefully, even at the pleading stage:

> Courts must therefore examine with care whether a plaintiff has made out a prima facie case of disparate impact and prompt resolution of these cases is important. A plaintiff who fails to allege facts *at the pleading stage* or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact.

*Id.* (emphasis added). TBS's allegations do not survive this scrutiny.

TBS asserts that Zion's rental inspection Ordinance imposes a disproportionate toll on rental property owners with mostly black and Latino tenants. Am. Compl. ¶ 24. The Amended Complaint provides historical and census data on the demographics of Zion and its rental market, essentially alleging a divided housing market where blacks are largely renters and white residents are largely homeowners. *Id.* ¶¶ 7-9, 15. According to TBS, Zion's population is 31% black, 27% Latino, and 48.9% white. *Id.* ¶ 7. Renters, in supposed contrast, are 39.3% black, 14.9% Latino, and 39% white. *Id.*

TBS's response brief does not lay out a chain of inferences explaining how the Ordinance will *cause* a racially disparate impact, as distinct from just resulting in a disparate impact. Apparently, TBS's theory is that minorities are a disproportionate segment of Zion's rental community. Am. Compl. ¶¶ 7-9, 15. And so even though the regulation applies on its face to all rental units, it will affect Zion's minority population in a discriminatory way by singling out the rental community in the first place. But by that way of thinking, *every* Zion ordinance that addresses only rental property would be grounds for a disparate impact claim. As *Inclusive Communities Project* reminds courts, however, racial imbalance is not alone sufficient to make out a disparate impact claim: causation is still required. The Amended Complaint here is devoid of allegations that plausibly suggest that Zion has *caused* the racially disproportionate impact that might result from the Ordinance.

TBS also seems to argue that the rental inspection Ordinance will disproportionately drive landlords out of business who rent primarily to minority tenants. By increasing the cost of doing business, TBS essentially says that the Ordinance will force TBS to close up shop.[14] If it has to shutter (and if other landlords with similar tenant bases have to do so), then racial minorities will experience the discriminatory effect of shortages in rental housing. There are a couple of problems with this argument. First, there is no allegation that landlords

---

[14] This is different from the more straightforward argument that inspection fees would be passed along from landlords to renters, resulting in higher rental rates for all Zion renters. That, in turn, would conceivably make less affordable housing available for any renter. And because minorities are, according to TBS, overrepresented in the rental community and in the Section 8 voucher community, they would be particularly vulnerable to a general rent hike. This theory is not pursued, and TBS instead decided to focus on its own profitability.

who rent to non-minorities would be affected any differently than TBS; the rental inspection Ordinance applies to all landlords. TBS did not allege that renting to minorities is comparatively less profitable than renting to non-minorities, or allege any other facts suggesting that landlords who rent to non-minorities will not feel the inspection-fee impact any less than TBS.[15] Nor did TBS allege that Zion's rental inspection fees are substantially higher than comparable cities.[16]

When TBS does offer statistics, they do not mean what TBS thinks they do. To be sure, statistics of course might be very helpful in adequately alleging a disparate impact claim. *Jones v. Nat'l Council of Young Men's Christian Associations of the United States of Am.*, 48 F. Supp. 3d 1054, 1092 (N.D. Ill. 2014); *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575–76 (2d Cir. 2003) ("Statistical evidence is also normally used in cases involving fair housing disparate impact claims."). In *Gallagher v. Magner*, for instance, there was a massive disparity between blacks as a percentage of a city's population (11.7%) and blacks as a percentage of those in the city enrolled in Section 8 housing programs (61-62%). 619 F.3d 823, 834 (8th Cir. 2010). That, in combination, with the plaintiff's pleading

---

[15] TBS might have tried to use statistical data to argue that the rental inspection fee is too high for landlords more generally, which will lead to less available rental housing in Zion overall. That would then ostensibly impact minorities more than others, according to the way TBS reads the data (because minorities are overrepresented as renters and potentially as Section 8 tenants). But TBS did not offer that argument, and it is not the Court's responsibility to make arguments for either side.

[16] *See, e.g.*, Highwood, Illinois, Municipal Code § 3-2A-1 (rental inspection of a property is $150 per unit up to 5 units, then $125 from 5 to 49 units, then $70 for the 50th unit and above); City of Waukegan, Illinois, Municipal Code § 14-1101 (rental inspection fees of $30 per unit, $75 per unit needing re-inspection); Wood Dale, Illinois, Municipal Code § 6.1614 (rental "registration fee" for multi-family home is $150.00 per building plus $50.00 per unit in excess of 1; "Rental reinspection fee" is $250.00 per inspection).

of the "City's aggressive Housing Code enforcement practices" leading to evictions and forced property sales, was enough to adequately state a disparate impact claim (and then to survive summary judgment). *Id.* at 834-838.

Here, the demographic statistics cited by TBS do not plausibly suggest a disparate impact. TBS equates Zion's "Section 8" rental tenants with blacks and other minorities. Am. Compl. ¶ 13 ("'Section 8' is a proxy for race"); Pl's. Resp. Br. at 1 (contending that "Section 8" is a "term commonly understood to denote African-Americans and Latinos, as well as people with children.") TBS alleges that, out of the blacks receiving Section 8 help in Lake County, the city breakdown of where they end up living is as follows: "By 1993, almost 80% of subsidized black families were located in two towns, Zion (62%) which was (at that time) 22% black, and North Chicago (18%) which was 34% black, with another 6% in Waukegan which was 20% black." Am. Compl. ¶ 13. [17] But these numbers do *not* establish the percentage of black participation in the area's Section 8 program, Instead, that data shows the distribution of black Section 8 participants by *town*, and then reports the percentage of blacks compared to the overall populations in those towns. That does *not* establish what percentage of Section 8 recipients are black. And the figures are dated, reaching back nearly 25 years. As a result, these statistics do not help TBS state a disparate impact claim.

TBS next compares the percentage of blacks in Zion's overall population to the percentage of blacks in Zion's rental community. According to the Amended

---

[17] TBS cited an online link to a research report on this topic, but the link was broken when the Court tried it on September 22, 2017. TBS did not supply a copy of the report.

Complaint, blacks make up 31% of Zion's population and Latinos constitute 27%. Am. Compl. ¶ 7. In comparison, among renters in Zion, blacks account for 39.3% of tenants and Latinos are 14.9%. *Id.* Again, TBS offers no explanation for why the different percentages matter, nor—more precisely—how they plausibly suggest that Zion's Ordinance *caused* (or will cause) a disparate impact. In absolute terms, there is an 8.3% difference (and relatively, 26.7% difference) between Zion's percentage of black residents and renters (39.3% − 31% = 8.3%). The meaning of that difference is unexplained by TBS. And to the extent that TBS cites these statistics to make any argument about Latinos, that makes no sense. There are *fewer* Latinos percentage-wise in Zion's rental community than in Zion's general population. So any inference about a burden on renters created by the rental inspection Ordinance (based solely on those figures) would actually go the other way.

In promoting the idea that Zion is causing a disparate impact, TBS also implies that the Ordinance hands Zion unbounded discretion in deciding which properties pass the inspection. Am. Compl ¶ 23. But the Ordinance's text instructs that "[t]he code official shall issue certificates of compliance on the condition that the residential rental property remains in a safe, habitable, and *code-compliant condition.*" Zion Code § 10-180(5)(d) (emphasis added). Zion's Building Department publishes a copy of the actual inspection checklist used for certifications, laying out all the things that will be looked at by inspectors. City of Zion, City of Zion Building Department Rental Housing and Inspection Checklist ("Zion Inspection Checklist"), *available              at              http://www.cityofzion.com/wp-*

*content/uploads/2016/01/2016_rental_inspection_checklist.pdf*. Almost every one of the checklist boxes is tethered to an explicit reference to Zion's municipal code (or more precisely, to the International Property Maintenance Code, which Zion has adopted in full).[18] So, for instance, there is nothing arbitrary about having a checkbox for "No insects/rodents visible" in the laundry area, supported by a reference to Sections 306.1 and 302.5 of the property maintenance code. *Id.* In fact, out of the 44 different checkbox items, only six of them have no citation to a code, and they are hardly areas of unfettered discretion: "CO [carbon monoxide] Detectors present and operable where gas service is present," (repeated for "Kitchen" and "Basement & Habitable Space"); "CO Detectors present and operable within 15 foot[sic] of bedroom"; "Electrical outlets/lighting/wiring in good repair"; "No fire/safety hazards including water heater or furnace areas," and (for "Hallway and Stairs") "Exit signs visible and Maintained." *Id.* To support its conclusion of arbitrary discretion, TBS Group mentions neither the relevant municipal code nor the actual inspection checklist in its pleadings. All in all, the Amended Complaint does not adequately allege that Zion caused, or will cause, a disparate impact via the rental inspection Ordinance.

### 2. Comprehensive Plan

As noted earlier, in its response brief, TBS mentions the Comprehensive Plan two times: once, in repeating the conclusory allegation that the Plan comprises an attempt to limit black and Latino rentals, Pl's. Resp. Br. at 2, and second in an

---

[18] *See* City of Zion, Building Codes, http://www.cityofzion.com/building-department/building-codes (listing codes that Zion has adopted) (last accessed Sept. 22, 2017).

argument point heading of the brief, *id.* at 5 ("Count I States Claims for violation of 42 U.S.C. §§ 3604(a)-(b) relative to Defendant's Ordinance and Comprehensive Plan"). That is not nearly enough to explain how the Plan has a racially disparate impact and, more importantly, how Zion has caused that disparate impact. It is especially important to understand the legal *effect*—if any—of the Plan, because disparate impact liability requires a discriminatory effect. TBS says nothing about that. And, again, without any factual allegations on how the Plan was created, it is impossible to assess whether TBS has adequately alleged that Zion's adoption of the Plan has *caused* the effect (whatever the effect is). No disparate impact claim has been adequately pled as to the Comprehensive Plan.[19]

Relatedly, TBS has failed to cure the statutory standing deficiency as to the Comprehensive Plan. To qualify as an "aggrieved person" under the Fair Housing Act, one must either (1) "claim[] to have been injured by a discriminatory housing practice"; or (2) "believe" that one "will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i). The prior Opinion held that that "Plaintiff has failed to allege that it is an aggrieved person in regards to the Comprehensive Plan. Plaintiff has not alleged that any of its properties will be moved or that it will be required to stop renting to any person on the basis of origin, race, or color because of the Comprehensive Plan." R. 22, Opinion and Order, Jan 23. 2017, at 6-7. Nothing in the Amended Complaint fixes the problem—not only does the Amended Complaint sufficiently allege a *disparate* impact, it fails to allege *any*

---

[19]

impact on TBS. TBS does not even respond to Zion's argument about standing, Def's. Rep. Br. at 4. And the additional historical details that TBS provides in its amended complaint do not do anything to show why TBS should now be considered injured or about to be injured by the Plan.

## IV. Conclusion

Zion's motion to dismiss is granted. Because TBS already had a chance to amend the complaint after the prior dismissal, and because it has not asked for another chance to replead (indeed, TBS says that it has provided "all it knows," Pl's. Resp. Br. at 5), the dismissal this time is with prejudice. Judgment will be entered in favor of Zion. The case is dismissed with prejudice.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 6, 2017